FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★     SEP 15 2005     ★

P.M. :
TIME A.M. :

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

MITCHELL STEIN and JULIE STEIN,                               03 CV 5488 (ARR)

                        Plaintiffs,          NOT FOR ELECTRONIC
                                                  OR PRINT
     -against-                                            PUBLICATION

MELVIN BENTOR, PARK SLOPE LEASING                  OPINION AND ORDER
CORPORATION, and JIANG JIAN RONG

                        Defendants.

------------------------------------------------------------------- X

ROSS, United States District Judge:

Plaintiffs Mitchell Stein ("Stein") and Julie Stein ("J. Stein") commenced this personal injury action on October 18, 2003, alleging that defendant Melvin Bentor ("Bentor"), driving a vehicle with the consent of the vehicle's owner, defendant Park Slope Leasing Corporation ("Park Slope Leasing"), and defendant Jiang Jian Rong ("Rong") negligently caused an accident on September 3, 2003 resulting in injuries to plaintiffs. Defendants Bentor, Park Slope Leasing, and Rong have now filed motions for summary judgment, claiming that plaintiffs have not sufficiently alleged a "serious injury" as required by N.Y. Ins. Law § 5102(d). In addition, defendant Rong has filed a motion for summary judgment on the issue of liability. For the reasons set forth below, the defendants' motions are granted in part and denied in part.

## BACKGROUND

For the purposes of this summary judgment motion, the parties do not contest the basic facts surrounding the accident at issue. On September 3, 2002, the parties were involved in a motor vehicle accident on the Brooklyn-Queens Expressway in Queens County, New York. Def.

Bentor/Park Slope Leasing 56.1 Stmt. ¶ 2. The front end of Rong's vehicle struck Stein's vehicle in the rear. Id. ¶ 3. Rong's vehicle was struck in the rear by a truck owned by Park Slope Leasing, which was driven by Bentor. Id. ¶ 4. Following the accident, Stein pulled over his vehicle and exited it unassisted. Stein Dep. at 49. He received no medical assistance at the scene and was not taken to the hospital. Id. at 66. Immediately following the collision, he drove his vehicle back to Pennsylvania, where he resides. Id. at 69. He drove directly to the emergency room at Saint Mary's Hospital in Langhorne, Pennsylvania to seek treatment for pain in his head, neck, and lower back. Id. He was examined, treated, and released on the day of the accident. Id. at 71-74.

On September 4, 2002, Stein sought treatment from a physician, Jon Fisher, D.O., complaining of neck and lower back symptoms. Pl. Ex. D at 5. Dr. Fisher performed an initial physical examination of Stein and also ordered X-rays. At Dr. Fisher's request, Paul J. Weiser, M.D., performed an MRI of Stein's lumbar spine on November 1, 2002. He concluded that there is "mild degenerative disc disease at L4-5 and L5-S1," noting that there are small disc bulges at L4-5 and L5-S1. Pl. Ex. D at 10. In addition, Lawrence Ratner, M..D., performed an MRI of Stein's cervical spine on February 25, 2003.[1] Dr. Ratner concluded that there was straightening of the cervical spine, but no evidence of a herniated disc. Def. Bentor/Park Slope Leasing Ex. C at 2.

Based on his physical examination of Stein and the X-rays, MRIs, and EMGs, Dr. Fisher diagnosed Stein with injuries to his cervical and lumbosacral spine regions with radicular

---

[1] While the MRI reports by Dr. Wiesner and Dr. Lawrence Ratner are not in the form of affirmations, plaintiff's expert, Dr. Fisher, has submitted a declaration and an affidavit in which he relies on both reports.

symptomatology into his right leg, which correlates with bulging discs at L4/L5 and L5/S1; straightening of the cervical spine; chronic cervical strain and sprain; chronic cervical myositis; chronic lumbar radiculitis right leg with associated bulging disc at L4/L5 and L5/S1; chronic lumbosacral strain and sprain secondary to above; post concussive syndrome; anxiety reaction; and post traumatic syndrome. Id. at 8. Dr. Fisher prescribed a treatment of epidural injections into Stein's lumbosacral region and out-patient physical therapy. Id. at 7. Dr. Eric Ratner, an anesthesiologist specializing in pain reduction, gave Stein an epidural injection. Id. At Stein's final visit to Dr. Fisher's office, Dr. Fisher concluded that Stein's symptoms persisted. Pl. Ex. D at 8. Dr. Fisher instructed Stein to continue a home exercise program. Id. In Dr. Fisher's opinion, with a reasonable degree of medical certainty, Stein suffered permanent injury to his cervical and lumbar spine. Id. at 9-10.

Stein also presented to Thomas Corcoran, M.D., on December 17, 2002, January 28, 2003, and July 19, 2004. Pl. Ex. C at 1-2. On physical examination, Dr. Corcoran concluded that Stein had approximately 80% normal lumbar motion, tenderness over the C5 through C7 spinous processes, and tenderness over the right sciatic notch. Id. at 4. An MRI of the lumbar spine showed disc bulging at L4/L5 and L5/S1.[2] Id. X-rays of the cervical spine did not show any bony abnormalities, but they did reveal mild straightening, lumbar radiculapathy, lumbar acceleration/deceleration injury, cervical acceleration/deceleration injury, and L4 through S1 spondylosis. Id. Dr. Corcoran recommended a treatment of epidural injections, which Stein

---

[2] The court notes that it is unclear from the record whether Dr. Corcoran is relying on the November 1, 2002 MRI, which was ordered by Dr. Fisher, or a later MRI, which Dr. Corcoran ordered on July 5, 2005. The latter is not in the record, but is relied upon in a report by defendants Bentor and Park Slope Leasing's expert Dr. Tantleff.

received. Id. at 6. In addition, he prescribed a back brace, which Stein wore for approximately one month. Id. Dr. Corcoran opined that Stein has "chronic radicular symptoms which have limited his activities" and which are of a "serious" and "permanent nature." Id.

On October 27, 2004, William J. Kulak, M.D., performed an independent medical examination of Stein on behalf of defendants Bentor and Park Slope Leasing. Def. Bentor/Park Slope Leasing Ex. N at 1. Upon physical examination of Stein, Dr. Kulak diagnosed him with soft tissue injuries to the cervical and lower spine "with apparent resolution of symptoms and complaints only regarding the lower back." Id. at 5. With regard to Stein's complaint of tingling and numbness in his lower right extremity, Dr. Kulak opined that "[i]t is certainly not arising from any disc pathology." Id. Dr. Kulak further opined that Stein suffered from "mild symptoms for which further improvement and ultimately resolution is expected." Id. In addition, he concluded that "[p]ermanency is doubtful." Id.

On October 27, 2004, Dr. Edward M. Weiland, M.D., performed an independent neurological examination of Stein on behalf of defendants Bentor and Park Slope Leasing. Def. Bentor/Park Slope Leasing 56.1 Stmt. ¶ 11. Dr. Weiland diagnosed Stein with resolved cervical and lumbar strains and found no evidence of neurological disability for his activities or occupation. Id. ¶ 14-16. Dr. Weiland opined that, from a neurological perspective, Stein should be "able to perform activities of daily living and continue gainful employment, without restrictions." Id. ¶ 16.

On November 1, 2004, A. Robert Tantleff, M.D., reviewed three MRI images of Stein on behalf of defendants Bentor and Park Slope Leasing. With respect to the cervical spine, Dr. Tantleff concluded that there was "no evidence of compression, deviation, or displacement as a

result of discal abnormality nor is there evidence of a disc bulge, protrusion or herniation." Def. Bentor/Park Slope Leasing Ex. J at 2. Dr. Tantleff's review of the lumbar spine MRI dated November 1, 2002 revealed "atraumatic noncompressive degenerative disc bulges at L4/5 and L5/S1." Dr. Tantleff concluded that such bulging is the result of "dessication and degeneration and develops over the course of many years." Def. Bentor/Park Slope Leasing Ex. K at 3. Comparing the November 1, 2002 MRI to a later MRI of Stein's lumbar spine dated July 5, 2004, Dr. Tantleff found "no definable interval change." He opined that such a result is "consistent with the slow progressive nature of underlying chronic degenerative discogenic disc disease," suggesting that Stein's condition predated the traumatic events of September 3, 2002. Def. Bentor/Park Slope Leasing Ex. L at 2.

Stein was deposed on August 24, 2004. At his deposition, Stein testified that he had head, neck, and lower back pain after the accident. Pl. Dep. at 78. He testified that he later started experiencing leg numbness. Id. at 85. After his initial examination, Stein returned to Dr. Fisher's office for out-patient physical therapy two sessions per week for approximately six to nine months. Id. at 84. He testified that he was released from physical therapy roughly a year before the date of the deposition. Id. at 94. Stein stated that he continued to do stretching exercises recommended by Dr. Fisher at home after therapy sessions were terminated. Id. at 95. He testifies that he continues to feel numbness in his right leg, which generally occurs when he is sitting for approximately one hour. Id. at 103. He also stated that he occasionally feels lower back pain, roughly two to three times per month. Id. at 104. He testified that he did not have an accident either before or after the accident of September 3, 2002 that affected his back or neck. Id. at 105. As a result of the accident, he can not drive for the length of time that he could drive

previously because sitting in the car resulted in numbness in his leg. Id. at 107. He also testified that he experiences discomfort when he runs, goes on long bike rides, or performs other types of exercises. Id.

Stein admitted that he returned to work at his employer, Stein's Generator and Starter Service, the day following the accident. Id. at 108-09. He also testified that he continues to work from 8am to 5pm, five days per week, and could not recall if his injuries caused him to lose any time from his job. Id. Following the accident, however, Stein changed positions from the firm's only on the road salesperson to general manager. Id. at 110. As a salesperson, Stein was required to drive on the road for long period of time to various customers located along the East Coast. Id. at 11. Stein testified that because of his injuries he cannot go out on the road for a long period of time and thus has taken a position as a manager at a lower salary. Id. at 109. He could not recall the amount of his previous or current salary. Id. at 110.

In addition to his deposition testimony, Stein has submitted a declaration dated June 6, 2005. Pl. Ex. B. Consistent with his deposition testimony, Stein's declaration explains that his work responsibilities have changed significantly as a result of the accident. See id. ¶¶ 3-5. Although he continues to work for Stein's Generator, he can no longer travel to visit prospective and current customers. Id. ¶¶ 4-5. Stein describes his neck and back injuries much more extensively in his declaration than the deposition. See id. ¶¶ 6-7. He states he continues to have "persistent pain and spasm in [his] neck and back areas with numbness in his right leg," which "has continued from time of the accident and is ongoing to the present time." Id. ¶ 6. He further states that he has "persistent ongoing pain and spasm into [his] neck and lumbrosacral spine area," which is "made worse when there is motion or there is extended movement." Id. In

6

addition, he states that his ability to ride a bike or perform other recreational activities is limited "because of the pain and discomfort that [he has] approximately 3-4 days a week every week." Id. ¶ 8.

## DISCUSSION

A. Standard of Review for Summary Judgment

Under Rule 56, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). The substantive law determines the facts that are material to the outcome of a particular litigation. See Anderson, 477 U.S. at 250; Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.2d 1219, 1223 (2d Cir. 1994).

Defendant Rong has raised one independent question in his summary judgment motion: whether plaintiffs have established a genuine issue of material fact as to Rong's liability. Defendants Bentor, Park Slope, and Rong have raised one common question in their summary judgment motions: whether plaintiffs have established a genuine issue as to whether Stein suffered a "serious injury" as defined in N.Y. Ins. Law § 5102(d). New York has a no-fault insurance scheme, which limits the causes of action available against insured motorists. Under the New York plan, losses are generally compensable only via insurance claims. A common law tort claim for non-economic injuries is available only when the plaintiff has suffered a "serious injury." See N.Y. Ins. Law § 5104(a). Serious injury is defined as a personal injury which results in:

(1) "death;"
(2) "dismemberment;"
(3) "significant disfigurement;"
(4) "a fracture"
(5) "loss of a fetus"
(6) "permanent loss of use of a body organ, member, function or system;"
(7) "permanent consequential limitation of use of a body organ or member;"

8

(8)    "significant limitation of use of a body function or system;" or

(9)    "a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."

N.Y. Ins. Law § 5102(d). The court must determine as a threshold question "whether the evidence would warrant a jury finding that the injury falls within the class of injuries that, under no-fault, should be excluded from judicial remedy." Licari v. Elliott, 57 N.Y.2d 230, 238, 441 N.E.2d 1088, 1092, 455 N.Y.S.2d 570, 574 (1982).

B. Defendant Rong's Liability

Defendant Rong argues that no reasonable juror could conclude that he was operating his vehicle negligently when the accident occurred. Specifically, he contends that defendants Bentor and Park Slope Leasing are presumptively liable for the accident because their vehicle struck his vehicle in the rear causing his vehicle to rear-end Stein's vehicle. His argument relies on the well-settled New York law that "[a] rear-end collision with a stopped or stopping vehicle creates a prima facie case of liability with respect to the operator of the rear vehicle, requiring a nonnegligent explanation for the collision." Egerton v. New York City Board of Education, 19 A.D.3d 639 (2d Dep't 2005).

While Rong provides a correct statement of the law, this principle does not apply to the facts here. For summary judgment purposes, there is insufficient evidence establishing that Rong's vehicle was stopped or stopping at the time of the accident. Although Bentor and Park Slope Leasing have acknowledged that their vehicle made contact with Rong's vehicle, Def. Bentor/Park Slope Leasing 56.1 Stmt. ¶ 4, Rong has not presented any evidence establishing that

his vehicle was stopped or stopping at the time of the accident. In his affidavit, Rong simply stated that "[his] vehicle was struck in the rear by another vehicle, operated by co-defendant Melvin Bentor."[3] Def. Rong. Reply Ex. A ¶ 1. Stein's deposition sheds some light on whether defendant Rong's vehicle was in motion, but it is not conclusive. Stein testified that he was driving in heavy traffic the afternoon of the accident and his own car was stopped or stopping immediately prior to the accident. Pl. Dep. at 37. He did not remember if there were vehicles stopped behind him at the time of the accident. Id. at 38. However, he did not hear a horn or the sound of screeching brakes immediately before the accident occurred. Id. at 117. Furthermore, Stein testified that there was only a single impact to the rear of his vehicle. Id. at 115. While Stein's testimony could support the inference that defendant Rong's vehicle was at a standstill behind Stein's vehicle, it does not preclude a reasonable finding of fact to the contrary.

Viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, the court is not able to conclude that no reasonable juror could find that Rong was negligent. The deposition testimony of Stein gives rise to a genuine issue of material

---

[3] In addition to his own affidavit, Rong submitted a New York Department of Motor Vehicles Police Accident Report dated September 3, 2002 as evidence of the facts surrounding the accident. See Def. Rong Ex. H. In their opposition papers, defendants Bentor and Park Slope Leasing objected to the admissibility of the report on hearsay grounds. The court agrees that the report is inadmissible. The report is not properly authenticated because it was not "accompanied by a written declaration of its custodian or other qualified person ... certifying that was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; was kept in the course of the regularly conducted activity; and was made by the regularly conducted activity as a regular practice." Fed. R. Evid. 902(11). Consequently, the accident report is not admissible as a business record exception to the hearsay rule, see id. 803(6), nor does any other hearsay exception apply. Given that the police report is inadmissible, the court will not consider it with respect to the question of Defendant Rong's liability.

fact as to Rong's liability, and the court must therefore deny defendant Rong's motion for summary judgment on liability.

C. Serious Injury

To prevail on summary judgment in the "serious injury" context, the defendant must initially establish a prima facie case that the plaintiff did not sustain a serious injury within the meaning of New York's No-Fault Insurance Law. Barth v. Harris, No. 00 Civ. 1658, 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001). To meet this burden, the defendant may rely on unsworn reports by plaintiff's physicians, see McGovern v. Walls, 201 A.D.2d 628-29 (2d Dep't 1994), but reports by defendant's own retained physicians must be in the form of sworn affidavits or affirmations. See Marsh v. Wolfson, 186 A.D.2d 115, 115-16 (2d Dep't 1992); N.Y. C.P.L.R. 2106. Once the defendant has established a prima facie case that the plaintiff has not suffered a "serious injury" within the meaning of the statute, the burden shifts to the plaintiff to come forward with sufficient evidence to support his or her claim. Ebewo v. Martinez, 309 F.Supp.2d 600, 604 (S.D.N.Y. 2004) (citing Gaddy v. Eyler, 79 N.Y.2d 955 (1992)). Plaintiff must submit admissible evidence in the form of sworn affidavits or affirmations by physicians. Barth, 2001 WL 736802, at *2 (citing Bonsu v. Metro. Suburban Bus Auth., 202 A.D.2d 538 (2d Dep't 1994)).

The Court of Appeals has held that the statutory "serious injury" threshold requires objective proof of a plaintiff's injury; subjective complaints of pain alone will not suffice. Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 350 (2002). Such proof may come in the form of: (1) "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion;" or (2) "[a]n expert's qualitative assessment of a plaintiff's condition . . ., provided

that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." Id. (emphasis in original). The Court of Appeals subsequently stated that "even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury–such as a gap in treatment, an intervening medical problem or a preexisting condition–summary dismissal of the complaint may be appropriate." Pommells v. Perez, 4 N.Y.3d 566, 572 (2005). The Court went on to note that while "the law surely does not require a record of needless treatment in order to survive summary judgment" where there has been a gap in or cessation of treatment, a plaintiff "must offer some reasonable explanation for" that gap or cessation. Id. at 575. The Court also indicated that where a defendant has offered evidence that a preexisting condition caused the injuries, the plaintiff bears the burden of coming forward with evidence addressing the claimed lack of causation. Id. at 580.

Plaintiffs did not allege in their complaint that Stein's injuries were serious under any particular clause of section 5102(d). They argue in their brief, however, that Stein's injuries constitute a permanent loss of use of a body organ or member ("permanent loss"), a permanent consequential limitation of use of a body organ or member ("permanent consequential limitation"), and a significant limitation of use of a body function or system ("significant limitation").[4] In addition, plaintiffs argue that Stein's injury prevented him from performing

---

[4] It is also unclear from plaintiffs' brief whether plaintiffs allege that Stein suffered a serious injury under the "permanent loss" theory. For the purposes of this summary judgment opinion, the court assumes that plaintiffs have also alleged that Stein's injuries constitute a permanent loss of use of a body organ or member.

substantially all of his daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury ("90/180 limitation"). Defendants contend that a reasonable jury could not conclude that Stein's injuries were serious under any definition.

As a preliminary matter, defendants submitted medical evidence in support of their motion for summary judgment establishing a prima facie case that Stein had not sustained a serious injury within the meaning of section 5102(d). Having reviewed the MRIs from November 2002 and July 2004, defendants' expert, Dr. Tantleff, opined that the MRI of the cervical spine revealed no bulges and the MRIs of the lumbar spine revealed a longstanding degenerative disease not causally related to the accident. Def. Bentor/Park Slope Leasing Exs. J-L. Dr. Kulak, another defense expert, opined that Stein has only "mild complaints" and no permanent disability. Def. Bentor/Park Slope Leasing Ex. N at 5. Finally, defendants at least raised an issue as to causation, arguing that there was a cessation of treatment after the accident and a preexisting condition. The burden thus shifted to plaintiffs to come forward with admissible proof to raise a triable issue of fact.

1. Contributory Factors

Defendants contend that plaintiffs have not adequately explained the alleged cessation of treatment in January 2003 and that plaintiffs have adduced insufficient evidence addressing defendants' proof that Stein's injuries are a mere exacerbation of a preexisting degenerative disc condition.

As to the former argument, defendants contend that plaintiffs have failed to explain adequately an alleged eighteen-month gap between Stein's treatment and subsequent re-

13

examination. The New York Court of Appeals found recently in Pommells that "the so-called gap in treatment was, in reality, a cessation of all treatment." 4 N.Y.3d at 574. Here, defendants incorrectly identify a gap in Stein's treatment or, in the least, grossly overstate the duration of such a gap. In his declaration, Dr. Fisher states that Stein returned to his office on January 28, 2003. Pl. Ex. D at 2. Stein continued to experience lower back pain and radiculopathy at this time. At Dr. Fisher's recommendation, Stein began pain management and long-term exercise programs. Id. In his deposition, Stein testified that he returned to Dr. Fisher's office two sessions per week for outpatient physical therapy sessions for approximately six to nine months. Pl. Dep. at 84. Stein testified that after he was released from therapy, Dr. Fisher prescribed home exercises, which Stein did twice a week. Id. at 95. According to Dr. Fisher, final treatment ceased after Stein's last visit to his office on July 19, 2004. Pl. Ex. D at 3. Drawing all inferences in plaintiffs' favor, it appears that Stein participated in physical therapy until the time he initiated this lawsuit on October 18, 2003, continued to do exercises at home afterwards, and made his final visit to his treating physician on July 19, 2004. Based on the record, a reasonable juror could conclude that there was no gap in Stein's treatment.

Moreover, were defendants to establish a gap in Stein's treatment, plaintiffs have offered a reasonable explanation for cessation of treatment. Under Pommells, "a cessation of treatment is not dispositive," but plaintiff must offer a "reasonable explanation." 4 N.Y.3d at 574. In his declaration, Stein explained that his doctors could provide no further treatment for his leg pain and numbness unless it continues to deteriorate and requires surgery. Pl. Ex. B ¶ 6. In addition, plaintiffs' expert Dr. Fisher stated that after the cessation of active treatment, "Mr. Stein was instructed to continue a home exercise program for further strengthening and stretching of his

14

musculoskeletal condition." Pl. Ex. D at 3. This case is similar to the facts of Brown v. Dunlap, where the plaintiff's doctor had determined that further therapy would be only palliative in nature and instructed the plaintiff to continue exercises at home. Confronted with this explanation for a cessation of treatment, the Court of Appeals concluded that "[a] plaintiff need not incur the additional expense of consultation, treatment or therapy, merely to establish the seriousness or causal relation of his injury." 4 N.Y.3d at 577. Here, unlike Pommells, whether there was a cessation of treatment raises a genuine issue of material fact and any possible cessation was sufficiently explained to raise an issue of fact and survive summary judgment.

Defendants also argue that Stein's neck and back injuries are not causally related to the September 3, 2002 accident, and that plaintiffs have failed to rebut the evidence of a preexisting condition. After reviewing an MRI of Stein's lumbar spine dated November 1, 2002, defendants' expert Dr. Tantleff concluded that Stein's injuries are the result of longstanding chronic degenerative disc disease. Def. Bentor/Park Slope Leasing Ex. K at 4. Neither of defendants' two other expert witnesses, Dr. Kulak and Dr. Weiland, suggested that Stein had a preexisting condition. See Def. Bentor/Park Slope Leasing Ex. N at 5; id. Ex. F ¶¶ 14-15. In his declaration, Stein stated that he had no neck or back injuries prior to the September 3, 2002 accident. Pl. Ex. B ¶ 6. The record reveals some objective evidence, as required by Toure, in support of the conclusion that the September 3, 2002 accident caused the injuries incurred by Stein. Dr. Corcoran's finding on December 17, 2002 that Stein has approximately eighty percent lumbar motion is consistent with the MRI results of November 1, 2002, which show disc bulging at L4-5 and L5-S1. Pl. Ex. C at 4. In addition, Dr. Corcoran found that Stein's EMG showed S1 radiculopathy, which supports Stein's complaints of

15

numbness and pains through his leg. Id. at 5. Based on his findings, Dr. Corcoran concluded

that even if "the disc bulging was present prior to the trauma from the motor vehicle accident,"

the disc changes were "asymptomatic" and thus "all the symptoms attributable to those levels

are directly related to the motor vehicle accident." Id. at 2. Dr. Fisher also based his

conclusion that Stein sustained injuries to his cervical and lumbar spinal regions on a physical

examination of Stein and the MRI results of November 1, 2002. Pl. Ex. D at 6. Dr. Corcoran

and Dr. Fisher's opinions that Stein's injuries were causally connected to the accident are

therefore not without objective basis, and summary judgment is unwarranted.

## 2. Permanent Consequential Limitation and Significant Limitation

"Whether a limitation of use or function is 'significant' or 'consequential' relates to

medical significance and involves a comparative determination of the degree or qualitative

nature of an injury based on the normal function, purpose and use of the body part." Dufel v.

Green, 84 N.Y. 2d 795, 798 (1995). Thus, to establish a "serious injury" under the eighth

definition, plaintiffs must submit quantitative evidence from an expert with respect to

diminished range of motion or an expert's qualitative assessment, based on objective evidence,

comparing Stein's present limitations to the normal function, purpose and use of the affected

body organ, member, function, or system.

Plaintiffs have done so here. Although defendants' submissions contesting Dr. Fisher and

Dr. Corcoran's interpretations of the MRIs, opining that the range of motion tests were subjective

in nature, and identifying contributory factors going to causality were sufficient to meet their

initial burden, plaintiffs' submissions in opposition raise material issues of fact as to whether

Stein sustained a "serious injury." Plaintiffs submitted an affirmed report from their medical

expert specifying the decreased range of motion in Stein's lumbar and cervical spines, along with evidence of disc bulges confirmed by MRI. Hyacinthe v. U-Haul Co., 278 A.D.2d 369, 370 (2d Dep't 2000) ("A bulging disc may constitute a serious injury within the meaning of Insurance Law § 5102(d)."). Dr. Fisher asserted that Stein's injuries were significant and causally related to the motor vehicle accident of September 3, 2002. This evidence is sufficient to raise a triable issue of fact. See Clervoix v. Edwards, 781 N.Y.S.2d 690 (2d Dep't 2004) (citing Toure, 98 N.Y.2d 345; Acosta v. Rubin, 2 A.D.3d 657 (2d Dep't 2003)).

Plaintiffs' expert Dr. Corcoran found Stein's range of motion to be approximately eighty percent of published norms. Pl. Ex. C at 4. A twenty-percent loss of range of motion raises a genuine issue of fact as to the existence of a serious injury. See Campbell v. Cloverleaf Transp., Inc., 5 A.D.3d 169, 170 (1st Dep't 2004); Howard v. King, 307 A.D.2d 278 (2d Dep't 2003). Defendants nonetheless argue that Dr. Corcoran's findings are subjective, reflecting the patient's degree of compliance or willingness. Toure, however, simply requires either an expert's "designation of a numeric percentage of a plaintiff's loss of range of motion" or a qualitative assessment of a plaintiff's condition if supported by objective evidence and a comparison of plaintiff's limitations to normal functions. 98 N.Y.2d at 350. Plaintiffs' expert has both indicated a twenty-percent loss of range of motion and made a qualitative assessment supported by MRIs from November 2002 indicating disc bulges.

Defendants also argue that courts, in order to permit a finding that an injury constituted a significant limitation, have required that the injury be more than fleeting in duration. Partlow v. Meehan, 155 A.D.2d 647, 648 (2d Dep't 1989). Defendants further argue that the cessation of treatment as of January 2003 is evidence that Stein's injury was not of substantial duration. As

17

discussed earlier, whether there was a gap in treatment is disputed and plaintiffs have put forth sufficient evidence demonstrating that Stein participated in physical therapy and home exercises for a substantial period of time to withstand summary judgment on that issue. Therefore, cessation of treatment does not provide a sufficient basis for defendants' argument that Stein's symptoms were fleeting. Moreover, Stein's physicians have concluded that his injuries were chronic and permanent. Pl. Ex. C at 2. In addition, defendants' expert, Dr. Tantleff, concluded that there was "no definable interval change" between the MRI dated November 1, 2002, which showed disc bulges at L4/5 and L5/S1, and the MRI dated July 5, 2004. Def. Ex. L at 2. Dr. Tantleff further stated that the disc bulges may be "causative of pain and symptoms." Id. Thus, even defendants' expert acknowledges that there is objective evidence that Stein's symptoms persisted for a long duration.

After reviewing the record as a whole, and taking the evidence in the light most favorable to plaintiff, the court finds that the medical evidence is sufficient to raise a triable question as to whether Stein suffered a significant limitation as to his neck and back under § 5102(d)'s definition of serious injury.

3. Permanent Loss of Use

In order to qualify as a permanent loss of use, the plaintiff must have suffered a total loss or limitation. Oberly v. Bangs Ambulance, Inc., 96 N.Y.2d 295, 727 N.Y.S.2d 378, 751 N.E.2d 457 (2001). Plaintiffs have offered no evidence of a total loss of use of Stein's cervical or lumbar spine. Accordingly, defendants' summary judgment motion on this point is granted.

4. 90/180 Impairment

18

Plaintiffs also allege a "serious injury" because Stein suffered a medically determined injury that prevented him from performing substantially all of the material acts of his customary daily activities for at least 90 out of the first 180 days immediately following the injury. See D'Avolio v. Dictaphone Corp., 822 F.2d 5, 6 (2d Cir. 1987) (citing Stossel v. Fleyshmahker, 117 Misc.2d 454, 455, 458 N.Y.S.2d 484 (1983)). This threshold will not be satisfied if the evidence establishes only a "slight curtailment" of the plaintiff's usual activities. Short v. Shawn, 188 S.D.2d 815 (3d Dept. 1992). Moreover, the plaintiff is required to present more than personal self-serving testimony as to the inability to perform his usual and customary activities. Cullum v. Washington, 227 A.D.2d 370 (2d Dept. 1996).

In his sworn affidavit, Dr. Corcoran states that Stein suffers from "chronic radicular symptoms which have limited his activities" and that "these injuries are serious" and "are of a permanent nature." Pl. Ex. C at 6. Dr. Fisher also concluded that, based on his treatment of Stein, he finds Stein "disabled from the injuries from this accident" and unable to perform his "usual and customary daily activities for at least 90 days during the 180 days immediately following accident." Pl. Ex. D at 7-8. Stein indicated in his deposition testimony that he returned to work at Stein's Generator the day after the accident. Pl. Dep. at 108. He further indicated that he did not remember if he missed any days of work as a result of his injury and continued to work nine hour days, five days per week. Id. at 109. Stein, however, explained that his daily role at work has changed dramatically as a result of the accident from salesman to general manager. Id. at 110. He testified that his position changed because could not drive for long periods of time, which was required for his sales position, due to the pain and numbness in his leg. Id. at 107. As a result, since the accident on September 3, 2002, he does not go on

his daily sales drives anymore and instead spends his days working at the company's facilities in Philadelphia. Id. at 108-09. A reasonable juror, should he credit the statements of Dr. Corcoran, Dr. Fisher, and Stein, could find that Stein suffered a "serious injury" that prevented him from performing his customary daily activities for at least 90 out of the first 180 days immediately following the accident.

## CONCLUSION

For the reasons stated above, defendants' motions for summary judgment are granted in part and denied in part. The court grants defendants' motion with respect to plaintiffs' permanent loss of use claim, as no reasonable juror could conclude that Stein suffered total loss or limitation as a result of the accident. The court denies defendants' motions with respect to plaintiffs' "significant limitation" and "90/180 impairment" claims, however, as plaintiffs have raised a genuine issue of material fact. In addition, the court denies defendant Rong's motion with respect to his own liability, as there exists a genuine issue of material fact.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: September 14, 2005
       Brooklyn, New York

SERVICE LIST:

<u>Attorneys for Plaintiffs</u>
Scott Marshall Pollack
Law Office of Scott Pollack
801 Old York Road
Suite 313 Noble Plaza
Jenkintown, PA 19046

Robert Jarred Bellinson
Law Office of Robert Bellinson, Esq.
150 East 58th - Suite 2310
New York, NY 10155-0121

<u>Attorney for Defendants Melvin Bentor and Park Slope Leasing Corporation</u>
Eileen Budd
Molod Spitz & Desantis
104 West 40th street
New York, NY 10018

<u>Attorney for Defendant Jiang Jian Rong</u>
Robert J. Valenti
Cheven, Keely & Hatzis,
40 Wall Street
New York, NY 10005